# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Wright, 2013 IL App (1st) 103232**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARSHAWN WRIGHT, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-3232 |
| Filed | March 1, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's contentions that a prosecution witness testified falsely about the witness's plea agreement in a federal case, that he was barred from presenting an alibi defense, and that his counsel was ineffective in failing to impeach the witness and in failing to give notice of the alibi defense were rejected by the appellate court, and his conviction for first degree murder was upheld. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-22863; the Hon. Neera Lall Walsh, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, Allan R. Sincox, and Linda Olthoff, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.

Justices Howse and Taylor concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Marshawn Wright was found guilty of the first degree murder of Sean Page. The jury also found that defendant personally discharged a firearm that caused Page's death. The trial court subsequently sentenced defendant to a term of 50 years' imprisonment for first degree murder with an additional term of 25 years for personally discharging a firearm that caused the death of another person, for a total sentence of 75 years.

¶ 2    Defendant appeals, arguing that (1) he was denied due process when the State failed to correct the allegedly false testimony of a witness about his provisional plea agreement in a federal case; (2) he was denied the fundamental right to testify on his behalf and to present a defense because the trial court precluded him from testifying about an alibi when no notice was given to the prosecution before trial; (3) his trial counsel was ineffective for failing to impeach the witness about his plea agreement, failing to give notice of an alibi defense and failing to object to inadmissible hearsay evidence in the testimony of a police detective; and (4) this court should correct the mittimus to reflect his conviction for first degree murder with a firearm enhancement.

¶ 3    Prior to trial, the State filed a motion *in limine*. One request from the State was to introduce evidence of defendant's criminal history for impeachment purposes if he testified, specifically a prior conviction in federal court for conspiracy to distribute a controlled substance for his participation in a heroin distribution ring and was awaiting sentence. The trial court denied the request to admit defendant's prior conviction, finding that the guilty finding was not final prior to sentencing. The State also requested to limit the information that could be elicited by the defense and the State regarding the federal case involving the heroin distribution ring in which the prosecution witness Aukey Williams received sentence considerations for his testimony in this case. As part of the plea agreement, the State asserted that Williams was required to testify truthfully in this case and in the federal cases against Mario Reeves and defendant. Defense counsel agreed that he would not question Williams about that case, other than the fact that he was receiving sentencing considerations for his

testimony. The prosecutor stated that she would be presenting this information to the jury during direct examination. The court advised defense counsel to make sure that defendant understood that as a matter of trial strategy, defense counsel would not be questioning Williams about the federal case at trial because that evidence could cause the jury to be biased against defendant. The court specifically asked defendant if he agreed with this strategy and he stated that he did. The State also agreed not to go into the subject of the federal case at trial.

¶ 4        The following evidence was presented at defendant's September 2010 jury trial.

¶ 5        Aukey Williams testified for the State and admitted that he had multiple prior convictions for possession of a controlled substance as well as convictions for possession of a stolen motor vehicle and aggravated unlawful use of a weapon. In September 2007, Williams was arrested for distribution of a controlled substance by the federal government for his participation in a heroin distribution ring. Williams stated that he had entered into a plea agreement for this charge with the federal prosecutors. He testified that his agreement was for a 30-year sentence. In August 2010, he agreed to an amendment to his plea agreement that in exchange for his truthful testimony in defendant's case, his sentence would be reduced by three years.

¶ 6        Williams testified that he had been friends with Sean Page since elementary school. Williams knew Earl Lewis by his nickname "Twan" and was familiar with him from the neighborhood. Williams stated that he had been friends with Mario "Rio" Reeves since 2002. Williams had also known defendant since 2003. Williams identified defendant in court.

¶ 7        On May 10, 2007, at around 3 p.m., Williams went to 79th and Langley in Chicago with Reeves, Maurice Williams (Maurice) and Marshawn Jones to speak with a person known as "Mo" about a problem with the sale of drugs. Mo had pretended to be Aukey Williams in order to sell drugs to individuals. Defendant was not with them. Williams talked to Mo outside of an apartment building on that corner. Mo was on the roof while Williams and his friends were on the sidewalk. Williams stated that Reeves had a "heated discussion" with Mo and asked Mo to come downstairs to continue the discussion. Mo refused. Williams testified that Mo then "started shooting off the roof." Page and Lewis were not present at this time. Reeves was shot in the leg, but did not seek medical attention. Williams said that he did not stay and speak with the police. Williams left with Reeves and Jones and got into a car. They drove to 80th and Langley. While Williams was looking for Mo, Williams received a phone call informing him that Mo had left the building.

¶ 8        While driving, Williams saw Page and Lewis on foot at 79th between Langley and Champlain. Williams initially drove past them and parked nearby. They exited the vehicle and walked east toward Page and Lewis. Williams testified that he stayed on the north side of the street, but Reeves crossed to the south side and walked directly toward Page and Lewis. Reeves approached Lewis and started a fight with him. Williams was watching from across the street.

¶ 9        At this time, Williams saw defendant a few feet ahead of him on the north side of the street. Williams observed a gun fall out of defendant's back pocket. Williams testified that the gun was a black 9 millimeter. Defendant picked the gun up and put it back in his pocket.

Then defendant ran across 79th toward Page and Lewis. Williams then ran across the street. As he was crossing the street, Williams heard about four or five gunshots. Williams did not see defendant shoot Page. Williams stated that he saw defendant running east toward Langley with a gun in his right hand. He also saw that Page was bleeding from his torso. Williams said he told Page to lie down. Both Page and Williams ran across 79th and Page collapsed. Williams saw the police arrive, but he did not talk to the police because he "didn't want [any] part of it."

¶ 10    Williams testified that he spoke with defendant on the telephone on May 10, 2007. Williams asked defendant if he was all right and why he "did it." Defendant responded that "he didn't know." Williams did not speak with police about Page's homicide until he was arrested in September 2007 on the federal felony case. Williams testified that he spoke with the police about the homicide prior to receiving any sentence deals. Williams identified several individuals on a surveillance video while speaking with the police at that time and named defendant as the shooter.

¶ 11    At trial, the prosecutor played the surveillance video recording of the homicide. Williams identified Page and Lewis as they walked on 79th. He also identified himself, Reeves, and defendant in the video. Williams stated that the video accurately showed what happened at the time Page was shot. Williams testified that a photograph taken from the video showed Reeves hitting Lewis. In several photographs, Williams identified defendant holding a weapon pointed at Page. He also identified himself in a photo with Page after Page had been shot.

¶ 12    Earl Lewis testified at the trial. He stated that people call him "Twan," which is his middle name. He admitted that he had a pending contempt case because he failed to appear after being served with a subpoena in the instant case. He also admitted that he had two prior felony convictions for attempted burglary.

¶ 13    Lewis stated that he was friends with Page and had known him for five years. Lewis identified Reeves as "Mohawk" and "Rio," whom he knew from the neighborhood. He also identified defendant in a photograph and in court as someone he knew from the neighborhood. Lewis also said he knew Williams from the neighborhood. Lewis stated that he was an "acquaintance" of a person called "Mo" and that Mo's real name was Bernard.

¶ 14    On May 10, 2007, Lewis was with Page in an apartment building at 79th and Langley with a female. They were on the second or third floor. He did not know if Mo was in that building that day. He heard gunshots while in the building. He then looked out the window and saw people running. He was unable to tell where the gunshots came from. Later, Lewis left with Page on foot to get cigarettes from the store. They walked down 79th toward Champlain and then turned around and came back.

¶ 15    While they were walking, someone called to them. They stopped and turned to see who it was. Lewis saw Reeves coming toward them. Lewis testified that Reeves said something and then "swung at [Lewis.] We got to fighting. And after we were fighting, [Lewis] heard the gunshots." When Lewis was first hit by Reeves, Page was standing nearby, but once Lewis started fighting with Reeves, he could not see where Page was. Lewis said the gunshots were right next to him and he grabbed Reeves and pulled Reeves over him. Lewis

stated that he could not see who was shooting. Lewis then "kicked" Reeves off and got up. He looked at Page and saw that Page's white shirt was "turning red." Lewis then started running. He saw Page walking, but Lewis went in the other direction.

¶ 16 The prosecutor then played the video and asked Lewis to identify the individuals. Lewis admitted that he had previously identified the people in the video. He identified himself walking with Page. He identified Reeves, who approached them and punched Lewis. Lewis also identified defendant as the person pointing a gun at Page. The last person he identified was Williams. Lewis stated that it was a true and accurate recording of what happened. At the time it occurred, he did not see defendant shoot Page, but he recognized defendant.

¶ 17 Mohammed Babul testified that he has a business at 641 East 79th Street. He stated security cameras had been outside his business since March 2007. These cameras were operational on May 10, 2007, and recorded the events on the street. The Chicago police department obtained the recordings from the security cameras.

¶ 18 J. Scott Denton testified that he was a forensic pathologist at the Cook County medical examiner's office and he performed Page's autopsy. He stated that the cause of death was multiple gunshot wounds and the manner of the death was homicide.

¶ 19 The State also presented evidence that fired bullet cartridge cases were recovered from the scene and sent to the Illinois State Police lab for analysis. Brian Mayland, a forensic scientist at the crime lab, analyzed the cartridge cases as well as bullets removed during the autopsy. Mayland testified that the bullets were fired from the same gun, either a 9 millimeter or .38-caliber gun. Mayland also found that the cartridges were fired from the same gun, a 9 millimeter. However, Mayland could not determine whether the bullets recovered during the autopsy and the cartridges recovered from the scene were fired from the same weapon because there was no firearm to analyze.

¶ 20 Sergeant Johnny Tate testified that in May 2007, he was working as a detective in Area Two, homicide section. On May 10, 2007, Sergeant Tate received an assignment to investigate Page's homicide. Sergeant Tate went to the scene on East 79th Street and viewed the surveillance video footage from two businesses on the street and requested an evidence technician to come to the scene and download the footage.

¶ 21 Sergeant Tate stated that on May 13, 2007, he spoke with Tiffany Andrews on the phone. Andrews lived at 7908 South Langley. Sergeant Tate learned that Andrews' building was the same building where an earlier shooting had occurred from the roof. He testified that Andrews told him that "there was an incident that had taken place earlier in the day and also that Earl Lewis was with the victim [Page] when he was shot." Andrews gave Sergeant Tate the contact information for Lewis and he was able to contact Lewis.

¶ 22 Later, in June 2007, Sergeant Tate continued to investigate the case. He spoke with an individual named Pierre Young at the sixth district police station. Sergeant Tate stated that after his conversation with Young, he was looking for defendant as a suspect in this case and also wanted to speak with Williams and Reeves. Sergeant Tate's involvement with the case ended after that date.

¶ 23 Detective John Otto testified that he was employed as a detective in the homicide section of Area Two. On September 20, 2007, he and his partner, Detective Richard Sullivan,

received an assignment to follow up on this case. He and his partner went to the Homan Square station to interview defendant and Williams about this case. He brought the DVD of the surveillance video with him. He spoke with defendant in an interview room with electronic recording. Detective Sullivan advised defendant of his *Miranda* rights and defendant agreed to speak with them.

¶ 24    The detectives showed defendant the surveillance video of Page's homicide. An agreed portion of defendant's interrogation was played for the jury. No transcription of the interrogation is included in the record. In the recording, defendant watched the video of the shooting and initially denied any involvement in Page's homicide. As Detective Otto opened the door to leave, defendant motioned for the detective to stay and the interrogation continued.

¶ 25    Defendant told him that he got "into it" with Mo. He said he went with Williams, Reeves and another man to talk to Mo, but Mo fired shots at them. Defendant said Page was in the building where Mo fired shots and defendant saw Page leave the building with Lewis. Defendant said that he thought Mo sent Page and Lewis out of the building. He followed them from the opposite side of the street. Then Williams and Reeves told him not to shoot. Page looked at defendant and balled up his fists. Defendant said, "it just happened." Defendant told the detective that he stole the gun from Page before the shooting because he knew where Page kept the weapon. Defendant said he fired the gun five times. After the shooting, he gave the gun to another person, who sold it.

¶ 26    The State rested after Detective Otto's testimony. Defendant moved for a directed finding, which the trial court denied.

¶ 27    Defendant testified on his own behalf. When defendant was asked by his attorney where he was on May 10, 2007, defendant responded that he believed he was at his girlfriend's house and she lived at 5631 South Woods. Defendant said he was there most of the day. At this point, the prosecutor objected and requested a sidebar.

¶ 28    During the sidebar, the prosecutor objected to the testimony because defendant had not given the State any notice of an alibi as an affirmative defense. Defense counsel asserted that he was not presenting an alibi because defendant was not going to have another witness verify that defendant was elsewhere. The trial court disagreed and found that the testimony was an alibi, which had not been filed as an affirmative defense. The court then sustained the objection and ordered that defendant's testimony about being at his girlfriend's house be stricken.

¶ 29    Defendant denied that he was the person in the video who shot Page. He admitted that he told the detectives that he committed the crime, but testified that his statement was not true. He said he did not commit the crime.

¶ 30    On cross-examination, defendant stated that he knew Page, Lewis, Williams and Reeves. Defendant also said he knew Mo and was familiar with the neighborhood around 79th Street. The prosecutor played the surveillance video. Defendant identified Page and Lewis in the video, but could not identify anyone else in the video. He denied that he was the person in the video who fired the gun.

¶ 31    Defendant also denied that he motioned for Detective Otto to stay. He said he moves his

hand when he talks. He admitted that he told the detectives that he committed the homicide, but testified that his statements were not true and he "told them what they wanted to hear."

¶ 32    The defense rested after defendant's testimony. Following deliberations, the jury found defendant guilty of first degree murder and that defendant personally discharged a firearm which proximately caused death to another person.

¶ 33    In October 2010, defendant filed his "motion for acquittal notwithstanding the verdict [and] in the alternative for a new trial." Defendant presented several grounds for a new trial, including an argument that the testimony about Williams' plea agreement was misstated. Defendant asserted that the State was aware that Williams' deal was for a substantially lower sentence than what was presented to the jury. At the hearing on defendant's motion, his attorney argued that Williams' plea agreement would result in a sentence of 13 years. However, the plea agreement was not made part of the record. The trial court denied defendant's motion for a new trial.

¶ 34    Following the sentencing hearing, the trial court sentenced defendant to a term of 50 years for the first degree murder with an additional 25-year enhancement for personally discharging a weapon that caused death.

¶ 35    This appeal followed.

¶ 36    Defendant first argues that he was denied due process because the State failed to correct Williams' testimony that his federal plea agreement would require him to serve 30 years with a reduction of 3 years for his truthful testimony in this case. Defendant contends that the signed plea agreement established that if Williams cooperated with the prosecution in the federal case and testified against defendant in this case, then he would receive a sentence of 15 years.

¶ 37    The State initially points out that Williams' plea agreement was not made part of the record in this case. At the hearing on defendant's motion for a new trial, defense counsel and the prosecutor both referred to and acknowledged that they had a copy of Williams' plea agreement, but neither gave a copy to the trial court or entered it into the record. On appeal, defendant has included the plea agreement as part of the appendix to his appellate brief.

¶ 38    The inclusion of evidence in an appendix is an improper supplementation of the record with information *dehors* the record. *People v. Williams*, 2012 IL App (1st) 100126, ¶ 27. Defendant responds that we should consider the plea agreement because this issue was resolved when another panel of this court denied the State's motion to strike defendant's brief and appendices. However, the denial of a motion prior to the disposition of the appeal is not final and can be revised at any time. See *Hwang v. Tyler*, 253 Ill. App. 3d 43, 45 (1993) (finding that the denial of a motion to dismiss an appeal was not final and could be reconsidered by panel in the disposition). Defendant also asks this court to take judicial notice of Williams' plea agreement that was filed in the federal case. "Proceedings in federal district court are a matter of which the courts of this state may take judicial notice." *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 396 n.3 (2006). Since it is clear from the record that both parties had possession of the plea agreement and there is no dispute that it is an accurate copy of Williams' plea agreement, we choose to take judicial notice of the plea agreement for purposes of disposing this appeal.

¶ 39 Defendant contends that the State presented false testimony from Williams regarding his plea agreement. Williams testified at trial that he had entered into a plea agreement in an unrelated federal case and he was subject to a sentence of 30 years. As part of his agreement, his sentence would be reduced by three years if he testified truthfully at defendant's trial. Defendant asserts that this testimony was false because the plea agreement contains a provision that allows for a reduction in the sentence if Williams cooperated in the case.

¶ 40 The plea agreement detailed Williams' five prior convictions and noted that he was still on parole for his most recent conviction at the time he committed the federal offense. The anticipated sentencing guideline, based on the offense and criminal history, was a range of 360 months (30 years) of imprisonment to life imprisonment. In the agreement, Williams agreed to "fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding." Williams also agreed "to the postponement of his sentencing until after the conclusion of his cooperation."

¶ 41 The plea agreement contained the following paragraphs about agreements relating to sentencing:

"12. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline §5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence rests solely with the Court.

13. If the government moves the Court, pursuant to Sentencing, as set forth in the preceding paragraph, this Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 60 percent of the low end of the applicable guidelines range or 60 percent of the statutory minimum sentence, whichever is greater. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate."

¶ 42 As part of the plea agreement, Williams agreed to the entry of a forfeiture judgment in the amount of $750,000. Also included as an exhibit to Williams' plea agreement was his grand jury statement detailing his involvement in the heroin distribution conspiracy.

¶ 43 According to that statement, Williams started selling heroin in the summer of 2006 with Mario Reeves. He called the operation the "Poison Line" and it operated in the area around 7900 South Cottage Grove in Chicago. Defendant worked for Williams as part of the "Poison Line." They sold approximately 150 bags a day at first, which increased to approximately 250 bags a day. The bags were priced at $10 per bag for approximately 0.2 grams of heroin.

Williams split the proceeds with Reeves and he estimated that he made a weekly profit of approximately $5,000, with some low weeks of around $3,000. Defendant worked as a manager and supervisor in the organization.

¶ 44   Defendant helped to supervise the person who packed the heroin, the security workers and a runner who carried the heroin to the sellers. He also helped to resupply the workers with heroin. In 2007, defendant helped set up a phone line in which customers would call to place orders. Defendant was the person who used the phone to arrange deals with customers. Later, Williams stopped using defendant to handle the phone and pack heroin because he thought defendant was lazy and did not return the full amount of money Williams thought the proceeds of the sales would net. Williams replaced defendant with Maurice Williams in April 2007. Defendant continued to work the night shift with Reeves in July 2007.

¶ 45   At the time of defendant's trial in September 2010, Williams had not been sentenced. In June 2011, the assistant United States Attorney filed a supplemental sentencing memorandum and requested that Williams receive a sentence of 360 months to life imprisonment. In July 2011, Williams was sentenced by the United States District Court to 180 months (15 years) in federal prison for conspiracy to possess with intent to distribute a controlled substance. Defendant maintains that the failure of the State to disclose at trial that Williams would receive a sentence of 15 years instead of 27 years as Williams testified to deprived defendant of due process.

¶ 46   Defendant asserts that the prosecutor knew that Williams' sentence would be less than 27 years and should have corrected his testimony. Defendant further argues that there was a reasonable likelihood this false testimony could have affected the outcome of the trial. The State responds that Williams' plea agreement did not provide any specific sentence or applicable sentencing range, but only estimated the sentencing range, which was advisory and nonbinding on the district judge. The State further contends that the plea agreement is subject to different interpretations and the prosecutor did not knowingly fail to correct Williams' testimony. Additionally, the State asserts in the alternative that even if the prosecution should have corrected Williams' testimony, defendant cannot show that Williams' false testimony affected the jury's verdict.

¶ 47   "It is well established that the State's knowing use of perjured testimony to obtain a criminal conviction violates a defendant's right to due process of law." *People v. Nowicki*, 385 Ill. App. 3d 53, 96 (2008) (citing *People v. Bowman*, 357 Ill. App. 3d 290, 303 (2005), citing *People v. Olinger*, 176 Ill. 2d 326, 345 (1997)). " 'A conviction obtained by the knowing use of false testimony [will] be set aside if there is a reasonable likelihood that the false testimony could have affected the verdict.' "*Nowicki*, 385 Ill. App. 3d at 96 (quoting *People v. Thurman*, 337 Ill. App. 3d 1029, 1032 (2003)). This is true even if the State did not solicit the false testimony, but nonetheless, fails to correct it. *Nowicki*, 385 Ill. App. 3d at 96. Further, these principles are applicable even when the witness's false testimony only goes toward his own credibility. *Nowicki*, 385 Ill. App. 3d at 96 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). As the Supreme Court observed, "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269. "However, even under those

circumstances, 'the State only has an obligation to correct the testimony of a witness when it has knowledge that the witness is mistaken in his testimony.' "*Nowicki*, 385 Ill. App. 3d at 96-97 (quoting *Bowman*, 357 Ill. App. 3d at 303).

¶ 48    First, when defendant raised this issue in his motion for a new trial, defense counsel and the prosecutor disagreed about what Williams' sentence would actually be under the plea agreement. At the hearing, defense counsel stated that Williams would receive a sentence of 16 years if the government moved for the reduction which would be further reduced to 13 years with the 3-year reduction for testifying at defendant's trial. In contrast, the prosecutor said that she interpreted the plea agreement to require a sentence of 30 years. She stated that when preparing for trial, Williams told her he was going to receive a sentence of 30 years and "[t]here was nothing within [her] knowledge that would be any different than that." There was no dispute that the testimony was accurate that in exchange for his truthful testimony at defendant's trial, Williams' sentence would be reduced by three years. Defense counsel noted that he had "no doubt in [his] mind [the prosecutor] and the State did not purposely do anything." However, defendant on appeal now argues that "[t]he prosecutor's protestations of ignorance lack credibility."

¶ 49    The record clearly shows that Williams had not been sentenced at the time of trial. The plea agreement provides for a sentence guideline of 30 years to life, with an option for the government to move for a reduction in which Williams' sentence which would be 60% of the low end of the applicable sentence. That reduction, however, was contingent upon Williams' cooperation. Further, the plea agreement does not explain what Williams was required to do under this agreement. There is nothing in the record or plea agreements that detail the extent of Williams' cooperation in the federal case. We cannot ascertain when and if Williams' cooperation had been completed. The plea agreement also provided that Williams' sentencing would be postponed until the conclusion of his cooperation and we point out that Williams was not sentenced until nearly a year after defendant's trial.

¶ 50    At trial, Williams testified that he would receive a reduction of three years for his testimony in the instant case. Neither attorney at the hearing on defendant's posttrial motion calculated Williams' sentence correctly; he received 15 years, not 13 or 27 years. The prosecutor stated that she believed Williams' sentence would be 30 years and defendant's trial counsel found the prosecutor to be credible and did not assert that the prosecutor knowingly failed to correct Williams' testimony. We also point out that neither attorney could have definitively stated what Williams' sentence would be at that time because he was not sentenced until a year after defendant's trial. Thus, there is nothing in the record to show that the prosecutor at trial knew that Williams' testimony about his anticipated sentence was false. Accordingly, the State did not have an obligation to correct the allegedly false testimony of the witness when it did not know that the witness's testimony was untrue.

¶ 51    Further, defense counsel did not question Williams about his plea agreement and the sentence reduction as agreed to before trial. Yet, all of this information was available to him before trial and counsel and defendant consented to this trial strategy on the record. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). Defense counsel did not want the details relating to the "Poison Line"

heroin distribution to be admitted at trial because that evidence would be extremely prejudicial to defendant. The reduction, if any, of Williams' sentence, however, was contingent upon his cooperation in the federal case and questions regarding his cooperation would undoubtedly have involved defendant's participation in the heroin distribution ring. The record does not provide any details for us to determine what was required of Williams to receive the sentence reduction and if and when he concluded his cooperation. The plea agreement showed that the sentencing range was a guideline with discretion left to the district court. Defendant's assertion that the State knew Williams would receive a sentence of less than 30 years is speculation and conjecture. Since Williams was not sentenced until nearly a year after defendant's trial, the record and plea agreement do not establish that Williams' testimony about his federal sentence was false.

¶ 52    Moreover, even if the State was aware of the false testimony, which we do not find, there was no reasonable likelihood that the false testimony affected the verdict. This standard is equivalent to the harmless error standard. *People v. Olinger*, 176 Ill. 2d 326, 348 (1997). The jury was aware of Williams' multiple prior convictions and that he entered into a plea agreement in an unrelated federal case. The jury was also informed that when Williams first gave information to the police about the shooting, he had not received any consideration from anyone. The jury was told that Williams was to receive a sentence reduction of three years in exchange for his truthful testimony at defendant's trial. The possibility that the government in the federal case could move to reduce the sentence further would not have affected the outcome when the jury was already aware of the State's request for leniency related to defendant's trial.

¶ 53    Defendant also describes Williams as the State's "key" witness whose credibility was "crucial." Williams testified that he was present at the homicide. He saw defendant with a gun before and after the shooting, but did not see defendant fire the gun. He identified defendant in the surveillance video as the person who shot Page. However, there was other evidence supporting defendant's conviction. Lewis testified that he was present at the time of the homicide, but he did not see the shooting because he was engaged in a fight with Reeves. Nevertheless, Lewis identified defendant as the shooter in the video. Defendant also admitted in a videotaped interrogation that he shot Page and detailed his actions before and after the shooting. He also identified himself in the video as the shooter. At trial, defendant denied he was the shooter and claimed that he told the police what they wanted to hear. Given the evidence presented at trial and the fact that the jury was informed of the reduction of Williams' sentence in exchange for his testimony, we find that the allegedly false testimony about Williams' sentence did not contribute to the jury's verdict.

¶ 54    Defendant also asserts that he received ineffective assistance of trial counsel because his attorney failed to impeach Williams about his intended sentence based on his plea agreement and about his grand jury statement which detailed his participation in the heroin ring. The State responds that defendant received effective assistance of counsel.

¶ 55    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant

must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "This determination must be made on the basis of the entire record, not isolated instances." *People v. Kluppelberg*, 257 Ill. App. 3d 516, 526 (1993). Effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994).

¶ 56    However, we have already concluded that even if the jury had been aware of the lesser federal sentence, there was no reasonable likelihood that the result would have been different. Since defendant must show that there was a reasonable probability that the result would have been different to establish prejudice under *Strickland*, this claim of ineffective assistance fails.

¶ 57    Moreover, the record establishes that it was defense counsel's trial strategy not to get into the details of Williams' federal case. At the hearing on the motion *in limine*, the trial court specifically asked defendant if he agreed with his attorney's strategy not to question Williams about the federal case and defendant affirmed this strategy. As we previously observed, "[u]nder the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *Carter*, 208 Ill. 2d at 319. The details of Williams' plea agreement and grand jury statement would have necessitated an explanation that Williams was eligible to receive a reduction in his sentence for cooperating with the federal prosecution of a heroin distribution ring in which defendant was intimately involved. It was a reasonable trial strategy not to present this information to the jury. Further, defendant speculates that the reduction in Williams' sentence was set at the time of trial. At the time of trial, Williams had not been sentenced and the record does not establish whether Williams had even cooperated in the federal case. Williams was to testify against defendant and Reeves in the federal case, but we have no details as to whether Reeves' trial had occurred or the extent of Williams' cooperation in that case. Based upon the record before us, it is unclear whether the federal prosecutors ever moved for the sentence reduction. However, we do know that only a month before sentencing, the federal prosecutor requested that Williams receive a sentence of 30 years, not the reduced sentence. Therefore, defendant cannot show that his trial counsel was ineffective in this decision.

¶ 58    Next, defendant contends that he was denied his fundamental right to testify on his own behalf and to present a defense because the trial court precluded him from testifying that he was somewhere else at the time of the shooting. Defendant concedes that he failed to raise this claim in his motion for a new trial, but asks this court to review it for plain error.

¶ 59    To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as

a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture. *Herron*, 215 Ill. 2d at 177.

¶ 60      Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that the second prong of the plain error rule is applicable because the denial of his right to present a complete defense implicates his fundamental rights. However, "[t]he first step of plain-error review is to determine whether any error occurred." *Lewis*, 234 Ill. 2d at 43. We will review defendant's claim to determine if there was any error before considering it under plain error.

¶ 61      During discovery, the State filed a motion for pretrial discovery, including notice of defendant's trial defenses. Defendant initially filed a notice asserting defenses of accident or misfortune, compulsion, and necessity. The State moved to strike these defenses and the trial court granted the motion. Defendant then amended his notice to include self-defense as his defense and the trial court postponed the trial date to allow the defense time to prepare. Then, the day before jury selection, defense counsel asked to withdraw the defense of self-defense and indicated that defendant would proceed on a theory of reasonable doubt. The trial court granted the withdrawal request.

¶ 62      During defendant's testimony, defense counsel asked defendant where he was on the day of the homicide and defendant answered that he was at his girlfriend's house. The prosecutor objected on the basis that notice of an alibi defense had not been presented prior to trial and asked for a sidebar. As pointed out above, defense counsel contended that defendant's testimony was not an alibi because the defense was not going to call any witnesses to verify that defendant was at another location at the time of Page's homicide. The trial court sustained the State's objection and found that defendant's testimony was an alibi that had not been disclosed during discovery and struck defendant's earlier response. However, the court did allow defendant to testify that he did not commit the crime and to deny that he was the shooter in the video.

¶ 63      Supreme Court Rule 413(d) provides:

"Subject to constitutional limitations and within a reasonable time after the filing of a

written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial ***." Ill. S. Ct. R. 413(d) (eff. July 1, 1982).

¶ 64    Supreme Court Rule 415(g)(i) provides:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule ***, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971).

¶ 65    "The purpose of the discovery rules 'is to prevent surprise or unfair advantage and to aid in the search for the truth.' " *People v. Burns*, 304 Ill. App. 3d 1, 8 (1999) (quoting *People v. Daniels*, 75 Ill. App. 3d 35, 41 (1979)). "Exclusion of alibi testimony has been recognized as an appropriate exercise of the trial court's discretionary authority under Rule 415(g)." *Burns*, 304 Ill. App. 3d at 8-9; see also *People v. Morris*, 229 Ill. App. 3d 144, 164-65 (1992). We review a trial court's imposition of a discovery sanction for an abuse of discretion. *People v. Ramsey*, 239 Ill. 2d 342, 429 (2010).

¶ 66    Defendant relies on several decisions from other states to support his argument. However, decisions from foreign jurisdictions are not binding in Illinois. See *People v. Mitchell*, 353 Ill. App. 3d 838, 842 (2004). Moreover, the failure to disclose an alibi defense is a discovery violation under the Illinois Supreme Court rules and cases from other jurisdictions have no bearing on our interpretation of Illinois court rules. See Ill. S. Ct. R. 413(d).

¶ 67    In this case, defendant failed to give notice of an alibi defense prior to his testimony that he was at another location at the time of the homicide. Prior to trial, defendant gave notice of several defense theories, but just before the start of the trial, defendant indicated that he would be relying on reasonable doubt. None of the prior noticed defenses, accident or misfortune, compulsion, necessity and self-defense, denied that defendant committed the crime, but would have excused the crime under certain situations. The State was given no notice or indication that defendant would raise an alibi and had no opportunity in discovery to refute defendant's last-minute alibi.

¶ 68    Contrary to his assertions, defendant was not deprived of his right to testify or present a defense. Because defendant failed to comply with Supreme Court Rule 413(d) when the alibi defense was not disclosed, the trial court did not abuse its discretion pursuant to Supreme Court Rule 415(g)(i) when it excluded the presentation of alibi evidence. Accordingly, we find no error in the trial court's ruling and defendant's claim for plain error fails. See *People v. Taylor*, 141 Ill. App. 3d 839 (1986), *aff'd*, 484 U.S. 400 (1988) (holding that the trial court did not abuse its discretion in refusing to let undisclosed witnesses testify as a discovery sanction); *People v. Spicer*, 158 Ill. App. 3d 699, 702 (1987) (the trial court did not abuse its discretion in excluding substantive evidence of the defendant's undisclosed defense); *People v. Partee*, 157 Ill. App. 3d 231 (1987) (trial court did not abuse its discretion in excluding undisclosed witness from testifying).

¶ 69    Defendant also contends that his trial counsel was ineffective for failing to give notice of his alibi defense. Specifically, defendant argues that his attorney did not understand that

-14-

defendant's testimony that he was at another place when the crime occurred was in fact an alibi defense that required notice to the State in order to be presented at trial. In order to prove ineffective assistance of counsel, defendant must overcome the presumption that this challenged conduct might be considered sound trial strategy under the circumstances. *People v. Giles*, 209 Ill. App. 3d 265, 269 (1991). A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003).

¶ 70     We do not have to reach this first prong if defendant cannot establish prejudice. Defendant asserts that his attorney's misunderstanding of the law prejudiced defendant, but fails to argue that there was a reasonable probability that the result of the proceeding would have been different, the necessary prejudice prong under *Strickland*. Here, the trial court excluded defendant's testimony that he was at his girlfriend's house at the time of the homicide. Defense counsel stated during the sidebar that he did not intend to call another witness to testify as part of an alibi defense. Therefore, even if notice of an alibi defense had been given, the only testimony to be presented would have been defendant's statements that he was at another location. Based upon a review of the entire record, there is no reasonable probability that the result would have been different if defendant's alibi testimony had been presented to the jury.

¶ 71     The jury heard testimony from two witnesses who identified defendant as the shooter in the surveillance video. Williams testified that he saw defendant with a gun before and after the shooting, but did not see defendant fire the weapon. Defendant confessed to the crime and identified himself as the shooter and detailed his commission of the crime. The jury was also able to view the video which corroborated the testimony of the witnesses. Given the overwhelming evidence of his guilt, defendant cannot show a reasonable probability that the result of the proceeding would have been different if his alibi testimony had been admitted as evidence.

¶ 72     Defendant argues a final claim of ineffective assistance of counsel regarding the introduction of inadmissible hearsay statements given during Sergeant Tate's testimony. Specifically, defendant asserts that Sergeant Tate's testimony about conversations with Tiffany Andrews and Pierre Young constituted inadmissible hearsay and that his attorney failed to object in both instances.

¶ 73     The hearsay rule generally prohibits the introduction of an out-of-court statement used to prove the truth of the matter asserted. *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2007). " 'To establish [his] course of conduct, a police officer may testify that [he] had a conversation with an individual and that [he] subsequently acted on the information received.' " *People v. Mims*, 403 Ill. App. 3d 884, 897 (2010) (quoting *People v. Johnson*, 199 Ill. App. 3d 577, 582 (1990)). " 'However, the officer cannot testify as to the substance of [his] conversation with the individual because that would be inadmissible hearsay.' " *Mims*, 403 Ill. App. 3d at 897 (quoting *Johnson*, 199 Ill. App. 3d at 582).

¶ 74     Sergeant Tate testified that he spoke with Andrews over the phone and learned that she lived at 7908 South Langley, which was near the scene of the homicide. Sergeant Tate also learned that an earlier shooting occurred off the roof of this building. Andrews told Sergeant

Tate that Page had been with Lewis on the day of the shooting and gave him Lewis's contact information.

¶ 75 However, defendant admits in his brief that Sergeant Tate's testimony about Page having been with Lewis that day and receiving Lewis's contact information was "arguably admissible as information showing the course of the police investigation." Despite this, defendant maintains that Sergeant Tate's testimony was hearsay which was used to prove that there had been another shooting earlier in the day and that this testimony corroborated Williams' prior testimony about the earlier shooting.

¶ 76 "Defense counsel's failure to object to trial testimony may be a matter of strategy and does not necessarily establish substandard performance." *People v. Graham*, 206 Ill. 2d 465, 478-79 (2003). As we previously stated, a decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. *Simmons*, 342 Ill. App. 3d at 191. We find that defendant's trial counsel did not object as part of his trial strategy. Sergeant Tate's testimony about his conversation with Andrews did not mention defendant. Defense counsel may not have wanted to call attention to the testimony about the prior shooting when none of the State witnesses had placed defendant at the location at the time.

¶ 77 Further, defendant cannot establish prejudice based on this testimony. Even if an objection had been made to the testimony about the prior shooting and the trial court sustained the objection, defendant cannot show that there was a reasonable probability that the result of the proceeding would have been different. Sergeant Tate's testimony about his conversation with Andrews did not mention defendant nor was defendant part of the subsequent course of the investigation as a result of this conversation. Accordingly, defendant cannot satisfy the *Strickland* test to establish a claim of ineffective assistance.

¶ 78 Defendant also complains that his attorney should have objected to Sergeant Tate's testimony regarding a conversation with Pierre Young. Sergeant Tate testified that on June 12, 2007, he had a conversation with Young and after the conversation, he was looking for defendant as a suspect in the case and also wanted to speak to Williams and Reeves. The substance of the conversation was not discussed. Defendant asserts that an objection should have been made because the testimony did not discuss who Young was or what his involvement was in the case. Defendant also notes that the information that Sergeant Tate was looking for defendant, Williams and Reeves was not to further his investigation because Sergeant Tate did not continue investigating this case. These assertions lack merit. As previously pointed out, police officers may testify about the course of their investigation, but cannot reveal the substance of a conversation. This testimony was not hearsay. Sergeant Tate did not testify about his conversation with Young, but stated that as a result, he was looking for defendant as a suspect and wanted to speak with Williams and Reeves. Also, the fact that Sergeant Tate did not continue the course of this investigation does not negate his testimony about the police investigation. Other police officers, including Detective Otto, who testified at trial, continued the investigation. Since there was no objectionable hearsay in this testimony, defense counsel was not ineffective for failing to make an objection.

¶ 79 Defendant makes a brief assertion that the cumulative effect of these alleged errors by his trial counsel "make it reasonably likely that without those errors the outcome of the trial

would have been different." We disagree. As previously discussed, defendant cannot show that the result of the trial would have been different but for his attorney's alleged errors. Accordingly, we find no cumulative error.

¶ 80        Finally, defendant asks this court to correct his mittimus because the mittimus incorrectly lists the offenses for which defendant was convicted. The mittimus lists two convictions for first degree murder instead of a single conviction for first degree murder with the firearm enhancement. The State concedes this error and asks this court to correct the mittimus to reflect the correct offenses for which defendant was convicted.

¶ 81        Under Supreme Court Rule 615(b)(1), this court has the authority to order a correction of the mittimus. Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967). Accordingly, we order the mittimus to be corrected and reflect the offenses for which defendant was convicted: one first degree murder conviction and sentence of 50 years with a 25-year firearm enhancement.

¶ 82        Based on the foregoing reasons, we affirm defendant's conviction and sentence, and the mittimus is corrected as ordered.

¶ 83        Affirmed; mittimus corrected.