2020 IL App (1st) 171731-U

No. 1-17-1731

Order filed February 11, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2016 CR 13972 |
| | ) | |
| VERDELL PARKER, | ) | The Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for armed habitual criminal where the evidence was sufficient for the jury to find that the State proved defendant's possession of a firearm beyond a reasonable doubt.

¶ 2   Following a jury trial, defendant Verdell Parker was convicted of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2016)) and sentenced to eight years' imprisonment.

On appeal, defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3    After an August 30, 2016 encounter with police, defendant was charged with thirteen counts, including a single count of AHC. The State elected to proceed to trial only on the AHC count.

¶ 4    At the ensuing jury trial, Chicago police officer Jeremy Carter testified that on the evening of August 30, 2016, he and his partner went to the Conservatory train station on the Chicago Transit Authority's (CTA) Green Line in response to a call. There, Carter boarded a train, where he saw defendant sitting with another individual. Carter asked defendant to stand up and show both the front and back of his waistband; defendant complied. At that point, the individual who was sitting next to defendant "stood up and immediately exited the train and began running." Carter and his partner proceeded to chase that individual. Carter did not see what defendant did after that point.

¶ 5    During Carter's direct testimony, the State introduced into evidence and played clips of CTA surveillance video footage, that do not contain audio. Carter testified that the first clip showed him and his partner asking defendant "to lift his shirt so we could see his waistband." The clip shows defendant standing up, lifting his shirt, and turning to reveal the front and back of his waistband. A separate video clip showed defendant and the other individual waiting for and boarding the train at the Pulaski stop. Carter explained that this clip preceded the first clip, because the Pulaski stop is the Green Line stop before the Conservatory stop. Two additional video clips, both from the Conservatory stop, showed Carter and his partner jogging in pursuit of the individual

who had been sitting next to defendant. Carter testified that he radioed other officers for help as pursued that individual.

¶ 6 On cross-examination, Carter acknowledged that when he first entered the train car, he did not notice anything unusual about the manner in which defendant was sitting. Carter agreed that defendant cooperated when he asked him to stand and lift his shirt, and that defendant turned around to show the back of his waistband. Carter did not see anything unusual or illegal on defendant at that time. Carter had no further interaction with defendant.

¶ 7 Officer Jose Hernandez testified that about 6:15 p.m., he went to the Conservatory CTA station to assist Carter. He observed defendant "running down the staircase" from the station platform to the sidewalk. Hernandez believed that defendant was running from Carter. Hernandez recalled that defendant "ran down the stairs, he looked in my direction, and then he jumped over the rail of the stairs and then continued running southbound." Hernandez was approximately ten feet from defendant when he came down the stairs. Hernandez yelled at defendant to stop, but he continued to run southbound into Garfield Park. During Hernandez's direct examination, the State introduced into evidence and played another clip of CTA video footage from the Conservatory train station; the clip shows defendant rapidly descending the stairway from the platform to street level and then running out of view. Meanwhile, Hernandez runs into view, and a police vehicle pulls up. The video shows multiple officers pursue defendant on foot. Hernandez testified that he was the officer that was closest to defendant during the pursuit.

¶ 8 Hernandez testified that he continued to yell at defendant to stop as he followed him into Garfield Park. Hernandez stated: "With his left hand – since I was behind him I couldn't really see exactly where – he just produced a silver handgun and then he continued to take a few more

strides with that handgun towards the lagoon." Hernandez testified that the gun "was produced from [defendant's] front area with his left hand" but he could not tell whether it had been retrieved from defendant's waistband or pocket. Hernandez was "between seven to ten feet behind" defendant when he saw the gun. While running with the gun, defendant made a sharp right turn and ran parallel to the lagoon before he "tosse[d] the silver handgun into the lagoon." Hernandez said he saw "exactly where the handgun landed" in the water, approximately ten feet from the shoreline. Shortly thereafter, officers placed defendant in custody.

¶ 9    After defendant was detained, Hernandez "ran exactly to the spot where I had observed him toss the weapon to visually mark it." To recover the firearm from the lagoon, police contacted the marine unit of the Chicago Police Department. Hernandez testified that Officer Laskowski of the marine unit arrived and searched in the water until it became too dark to continue. Another police unit arrived to "hold down the position" during the night.

¶ 10    The next morning, Hernandez returned to the site, where he directed another member of the marine unit (later identified as Edmund Echevarria) to the location where he observed the gun go into the water. After a few hours of searching, Echevarria pulled out a silver chrome revolver; Hernandez "recognized it immediately" as the same gun that defendant had tossed into the lagoon. Echevarria placed the handgun into a container, and Hernandez inventoried the weapon. Hernandez identified People's Exhibit 2 as the handgun.

¶ 11    On cross-examination, Hernandez stated that he first saw defendant running down the stairs at the CTA station and "hop a railing" before continuing to run. Hernandez acknowledged that in the arrest report he drafted, he did not mention that he had verbally commanded defendant to stop. Hernandez testified that defendant produced the gun "from his front area." He acknowledged that,

since he was behind defendant, he was not sure if the gun had been in defendant's waistband. He agreed that his arrest report stated that he observed defendant "remove a silver handgun from his front left waistline with his left hand." On re-direct examination, Hernandez testified that he could not tell whether defendant produced the handgun from his left waistband or from his left pocket.

¶ 12    Mariusz Laskowski testified that he is a member of the Chicago Police Department's marine unit. At approximately 7:18 p.m. on the evening of August 30, 2016, he went to the Garfield Park lagoon, where other officers were on the scene. After speaking with Hernandez, he went into the water and searched for a handgun. After about one hour, he stopped searching because it was getting dark.

¶ 13    Echevarria testified that he was a member of the Chicago Police Department's marine unit. On the morning of August 31, 2016, he was called to a location near the lagoon. Hernandez directed Echevarria to search a particular area of the lagoon. Echevarria, together with another officer, searched the lagoon on their hands and knees, feeling for objects on the bottom of the lagoon. The two officers combed the area several times before halting the search to "regroup and start a different grid pattern." At that point, Echevarria began using an underwater metal detector in the search. Eventually, the metal detector "ping[ed] on a large object," and Echevarria recovered a firearm from the lagoon. Echevarria testified that it took approximately two to three hours to locate the firearm. Consistent with the marine unit's procedures for evidence, Echevarria placed the gun in a paint can and sealed the container before turning it over to Hernandez. Echevarria identified People's Exhibit 2 as the firearm he recovered and People's Exhibit 3 as the container in which he placed the weapon.

¶ 14   After Echevarria's testimony, the parties stipulated that the site at the lagoon was secured by police between the first and second searches. The parties also stipulated that defendant had "previously been convicted of two qualifying felonies for the purpose of the armed habitual criminal statute." Following the stipulations, the State rested. The defense rested without calling any witnesses.

¶ 15   In closing argument, the prosecutor argued that when Carter asked defendant to show his waistband, police could not see that he was carrying a gun because it was "hidden on him * * * most likely in his pocket."

¶ 16   Defense counsel argued that Hernandez' testimony that he saw defendant remove a gun while chasing him from behind was not credible. Counsel argued that the gun was heavy and there was "no way [defendant] could have concealed" the gun while running down a stairwell, jumping over a railing, and running from police. Defense counsel also argued that Hernandez's testimony that he saw where the gun was tossed was inconsistent with the fact that it took several hours for police to recover a gun from the lagoon; counsel suggested that the gun "could have already been there." Defense counsel also replayed portions of the video footage to argue that defendant's movements while waiting to board the train at the Pulaski stop were inconsistent with having a "bulky heavy gun in his waistline." Counsel also urged that the video footage in which defendant showed his waistband at Carter's request "doesn't support Officer Hernandez's testimony." Defense counsel suggested that the gun "would not possibly fit in a pocket" and "would have fallen down [defendant's] pant leg" as he ran down the stairs at the train station.

¶ 17   In rebuttal, the prosecutor argued that the handgun at issue was small enough to be easily concealed in defendant's pocket. The prosecutor also argued that Hernandez's testimony was

consistent because he said he saw defendant retrieve the gun from his "waistline," although he could not see if defendant took it from his waistband or from a pocket.

¶ 18    The jury found defendant guilty of AHC. Defendant filed a motion for judgment notwithstanding the verdict and a motion for a new trial; both motions were denied. The court sentenced defendant to eight years' imprisonment and three years of mandatory supervised release. Defendant's motion to reconsider sentence was denied.

¶ 19    On appeal, defendant argues that his conviction should be reversed because the State failed to prove beyond a reasonable doubt that he possessed a firearm, as necessary to find him guilty of AHC.

¶ 20    When reviewing a challenge to the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). Furthermore, all reasonable inferences from the evidence are drawn in favor of the State. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. We will not retry the defendant or substitute our judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony or the credibility of witnesses. *Id*. Finally, we will not set aside a conviction unless the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt. *Id.* ¶ 72.

¶ 21    In order to sustain defendant's conviction for AHC, the State was required to prove beyond a reasonable doubt that he possessed a firearm after having been convicted two or more times of certain enumerated predicate offenses. 720 ILCS 5/24-1.7(a) (West 2016)). Defendant does not dispute that he had two qualifying predicate offenses, but he asserts that the State's evidence of

firearm possession was insufficient. Specifically, defendant contends that the testimony of Hernandez, the only witness who saw him with a gun, was inconsistent, impeached by his police report, and not credible. He further claims that Hernandez's testimony is contradicted by the State's other evidence, including the video footage. Defendant asserts that the recovery of a gun does not corroborate Hernandez's testimony, since it was not located for several hours. Finally, he argues that Hernandez's testimony is undermined by the large size of the gun, which makes it "highly unlikely" that defendant could have concealed it. For these reasons, defendant urges that the State failed to prove that he possessed a gun beyond a reasonable doubt.

¶ 22    After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant possessed the gun. In reaching this conclusion, we recognize that Hernandez was the only witness who claimed to have seen defendant holding a firearm. However, it is well-established that "the testimony of a single witness, if positive and credible, is sufficient to convict." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). "A reviewing court will not reverse a conviction simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible." *Id*. Our supreme court has specifically found that a single eyewitness's testimony may be sufficient to show that a person was armed. See *People v. Wright*, 2017 IL 119561, ¶¶ 76-77 (victim's testimony that codefendant displayed a firearm sufficient to support conviction for armed robbery); *People v. Washington*, 2012 IL 107993, ¶¶ 35-36 (given the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun. [Citations.]"). Given Hernandez's testimony that he saw defendant toss a gun into the lagoon and that the gun was recovered where Hernandez saw it fall in the water, we cannot

say that the evidence is so improbable or unsatisfactory as to create reasonable doubt of defendant's guilt.

¶ 23    Defendant's complained-of inconsistencies in Hernandez's testimony do not require reversal. Defendant suggests Hernandez could not credibly testify that he retrieved a gun "from his front area" since Hernandez was running behind him. Defendant also claims that Hernandez was "impeached by his own police report" because (1) his report did not mention that he commanded defendant to stop; and (2) the report stated that he saw defendant retrieve the gun from his "front left waistline" but at trial he admitted he could not be sure exactly from where the gun was retrieved. We cannot say that these purported inconsistences precluded the jury from believing Hernandez. "Minor inconsistencies * * * within one witness's testimony may affect the weight of the evidence but do not automatically create a reasonable doubt of guilt. [Citation.] *Corral*, 2019 IL App (1st) 171501, ¶ 85. Moreover, the trier of fact may accept or reject all or part of a witness's testimony. *Id.* It was the jury's role to assess the impact of any alleged inconsistences in deciding whether to accept Hernandez's testimony. Regardless of any discrepancies in Hernandez's testimony as to the precise manner in which he saw defendant initially retrieve a gun, the jury could rationally conclude that Hernandez did in fact see defendant with a gun in his hand, which he then tossed into the lagoon.

¶ 24    Next, we reject defendant's suggestion that other evidence necessarily precluded the jury from believing Hernandez's testimony that he possessed a gun. Defendant emphasizes Carter's testimony that he did not see a gun when defendant showed him his waistband, as well as the corresponding video footage from that encounter. Defendant essentially invites us to hold that no rational jury could accept the State's theory that he had concealed the gun at that time. We decline

to do so. Viewing the evidence in the light most favorable to the prosecution, the jury could rationally find that the gun was concealed on defendant, *e.g.*, in a pocket, when Carter encountered him. In other words, it was not unreasonable for the jury to believe that defendant retrieved the handgun as Hernandez chased him, even if it was concealed moments earlier.

¶ 25     Likewise, we reject defendant's argument that the other CTA video footage precluded the jury from finding that he possessed the gun. Defendant claims that his bodily movements—including "laying on top of a wooden box" at the Pulaski stop platform and the manner in which he "prop[ped] his left foot up" when sitting on the train—are inconsistent with him carrying a gun. Defendant also notes the video footage shows that he "does not appear to be encumbered by a heavy object in his left pocket" while running from police. Despite these contentions, it was the jury's role to determine "the reasonable inferences to be drawn from the evidence," *Wright*, 2017 IL 119561, ¶ 70, and we will not substitute our judgment for that of the jury. At trial, the jury had ample opportunity to consider the video evidence and assess defense counsel's argument that it was not feasible for defendant to have concealed a gun. The jury apparently rejected that argument and instead accepted the State's theory that the gun was concealed. Once again, we decline defendant's invitation to reweigh the evidence to reach an opposite inference.

¶ 26     We also reject defendant's suggestion that Hernandez's testimony is necessarily undermined by the evidence describing the efforts to recover the gun. Specifically, defendant argues that Hernandez's testimony that he saw "exactly" where the gun was tossed was "substantially discredited" by the evidence that it took three officers almost five hours to locate it. It was the jury's role to decide the relevance of this evidence, if any, with respect to Hernandez's credibility. As mentioned, it is not our role to reweigh the evidence. Regardless, even assuming

that this evidence contradicted Hernandez's claim that he remembered "exactly" where defendant tossed the gun, the jury was nevertheless free to credit his other testimony that he did, in fact, see defendant holding a firearm.

¶ 27    Finally, we address defendant's assertion that "[t]he gun itself further illustrates that Hernandez's testimony is less than credible." He states that the gun "is approximately seven inches long, four and a half inches wide, and on and one-quarter inch deep." He contends that, given the size of the gun in comparison to defendant (who is five feet and seven inches tall and 160 pounds according to his arrest report) "it is highly unlikely that he concealed this weapon from Officer Carter, and was able to move about freely * * * without the gun visibly impeding his movements."

¶ 28    We note that, in setting forth this argument, defendant's brief refers us to the appendix for photographs illustrating the dimensions of the gun; however, these photographs are not included in the appendix to the filed copy of the brief. Further, even had such photographs been attached to the appendix, we would not be able to consider them, unless they were made part of the record on appeal. See *People v. Wright*, 2013 IL App (1st) 103232, ¶ 38 ("The inclusion of evidence in an appendix is an improper supplementation of the record with information dehors the record."); *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994) ("evidence which is not part of the record on appeal is not to be considered by a reviewing court [citation] and attachments to briefs on appeal, not otherwise before the reviewing court, cannot be used to supplement the record. [Citation.]").[1]

---

[1]While this appeal was pending, this court granted defendant's motion to unseal, view, and photograph the physical trial exhibits, including the firearm. However, neither party moved to supplement the appellate record with any photographs, as contemplated by the Supreme Court Rules. See Ill. S. Ct. R. 608(a) (eff. July 1, 2017) ("[U]pon motion of a party, the court may allow photographs of exhibits to be filed as a supplement to the record on appeal, in lieu of the exhibits themselves, when such photographs accurately depict the exhibits themselves.").

¶ 29    In any event, even assuming that the gun has the dimensions stated in defendant's brief, that fact would not preclude the jury from finding that he concealed it before tossing it into the lagoon. The jury had the opportunity to examine the gun, view the CTA video footage and observe defendant in court. The jury was in the best position to decide all factual matters, including whether the gun was concealed on defendant. Again, it is not our role, as the reviewing court, to reweigh the evidence and make new factual determinations. Rather, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, a rational jury could find the State proved defendant's firearm possession beyond a reasonable doubt. Here, we find that it could.

¶ 30    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 31    Affirmed.